[No. 1798, December 14, 1915.]

# NEW YORK LIFE INSURANCE CO. v. CHAVES, Superintendent of Insurance.

### SYLLABUS BY THE COURT.

All moneys returned or allowed in abatement of future premiums to policy holders in a mutual life insurance company, which arise by reason of an overcharge on the actual cost of insurance occasioned by the overestimation of the death rate and administration expenses and the underestimation of the earnings on premiums by way of interest and gains by reason of lapses and forfeitures by the insurance

company when it fixes the arbitrary level premium in its policies, are "returned premiums," within the meaning of section 2810, Code 1915, and, as such, are exempt from taxation under said section.

Appeal from District Court, Santa Fé County; E. C. Abbott, Judge.

Action by the New York Life Insurance Company against Jacobo Chaves, Superintendent of Insurance. From judgment for defendant, plaintiff appeals. Reversed and remanded, with directions to award new trial.

FRANCIS C. WILSON of Santa Fé, for appellant.
(JAMES H. McINTOSH of New York, of counsel.)

A taxing act must be strictly construed, and where its construction is doubtful, the doubt must be resolved in favor of those upon whom the tax is laid.

Spreckels Sugar Company v. McClain, 192 U. S. 397, 48 L. Ed. 496; American Twine Co. v. Worthington, 141 U. S. 468, 35 L. Ed. 821; Hall Co. v. Com., 215 Mass. 326, 102 N. E. 364; People v. Sohmer, 141 N. Y. S. 635; Matter of Hodges, 148 N. Y. S. 424; McGannon v. State (Okla.), 124 Pac. 1063; Adams v. County, 35 Okla. 440, 130 Pac. 148; Com. v. Frank, 2 Chest. Co. Rep. 243; Dean v. Charlton, 27 Wis. 522; County Ct. v. Brammer, 68 W. Va. 25, 69 S. E. 450; Plow Co. v. Hays (Tenn.), 140 S. W. 1068; Ins. Co. v. Basford, 27 S. D. 164, 175, 130 N. W. 44; Hull Dock Co. v. Brown, 2 B. & Ad. 59; Stockton v. Barrett, 11 Cl. & F. 602; In re Thorley, 2 Ch. 613; Tennant v. Smith, 61 L. J. P. C. 11, 1892, A. C. 150 (H. of L.)

The money returned by plaintiff to its policy holders in New Mexico during year 1912 constituted "return premiums" within the meaning and intent of the statute.

Sec. 2, c. 48, L. 1909; Commonwealth v. Penn. Mutual Life Ins. Co., 2 P. C. R. 559 (April, 1915); Mutual

Benefit Life v. Commonwealth, 107 S. W. (Ky.) 802; Opinion Attorney General of California, dated May 24, 1911; Opinion Attorney General of Alabama, dated Dec. 8, 1911; Fuller v. Metropolitan Life Ins. Co., 70 Conn. 647, 21 Atl. 4, 10; N. Y. Life Ins. Co. v. Styles, 59 L. J. I. B. 291, L. R. 14 App. Cas. 381.

FRANK W. CLANCY, Attorney General, for the State.

The only question in this case concerns the meaning of the words "return premium." The statements of appellant conclusively establish that what is returned to the policy holder is "profit" and as such is not a "return premium."

The dividends are the results, not merely of over-payments of premiums upon the issuance of policies, but the earnings of the company by its various business operations in making loans, buying and selling securities, the increased value of securities purchased at low figures, and the profit derived from lapsed and forfeited policies.

The statutory exemption refers to fire insurance companies only.

## OPINION OF THE COURT.

PARKER, J.—The appellant brought an action in the court below to recover the sum of $954.31 from the appellee, who is superintendent of insurance of the state. This sum represents the amount of tax which the appellee required the appellant to pay, and which it paid under protest. The tax was exacted by the appellee under the provisions of section 2810, Code 1915, the pertinent provisions whereof are as follows:

"All insurance companies, partnerships or associations engaged in the transaction of the business of insurance in this state shall annually, on or before the 1st day of February in each year, pay to the superintendent of insurance two per centum on the gross amount of premiums received, less returned premiums within this state, during the year ending

the previous 31st day of December; and insurance companies shall be subject to no other taxation than herein provided, except upon real estate."

The cause was tried upon an agreed statement of facts, and resulted in a judgment against the appellant. A somewhat lengthy agreed statement of facts was submitted to the court, the pertinent provisions whereof may be summarized as follows: The appellant received during the year ending December 31, 1912, as premiums from its policy holders in the state, the sum of $147,846.83, and divided amongst its said policy holders in the state the sum of $47,715.50. That it is upon this sum of $47,-715.50 that the tax complained of was exacted by the appellee, which said sum the appellant claims is exempt from taxation under the provisions of the statute. This $47,715.50 is made up of two items, as follows: $44,-958.29 paid policy holders in cash; and $2,757.21 allowed on reduction of renewal premiums. That appellant is a mutual company, and conducts its business of life insurance on the mutual plan, having no capital stock and no stockholders, its board of directors being selected by the policy holders. That the insured receives his insurance at cost, which result is obtained by the company collecting its estimated premium in advance, and thereafter adjusting the actual cost, and returning the excess to the policy holder, which is called his share of the divisible surplus of the company. That this estimated premium is generally found to be in excess of the requirements, and the amount of this excess is ascertained at the end of each calendar year and is called divisible surplus, and is paid back to the policy holders, in one of the ways stated in his policy, which are said to be as follows: (a) paid in cash; or (b) applied towards the payment of any premium or premiums; or (c) applied to the purchase of a participating paid-up addition to the sum insured; or (d) left to accumulate to the credit of the policy at interest, and payable on the maturity of the policy or withdrawable in cash on any anniversary date of the insurance. That these excess premiums are exacted from the policy

holders as margins of safety, and that there is therefrom created what is called a divisible surplus or dividend fund, which said sum is accumulated by reason of the following conditions and results: (1) Money saved and not expended on account of lower mortality rate than the insurance company calculated and fixed; (2) money gained because of the receipt of a greater rate of interest on the moneys and assets of the company than that calculated; (3) money gained by reason of less expenses of operation and management of the insurance business than that calculated; and (4) reduction in necessary reserve because of diminished liability on account of lapsed and forfeited policies.

In support of the judgment the Attorney General, in behalf of the appellee, argues that the words "returned premiums" have no proper application to life insurance companies, and have proper application to fire insurance companies only, who return portions of unearned premiums in cases of the cancellation of fire insurance policies prior to the end of the term for which the premium was paid. He argues, further, that the insurance company is distinct from its policy holders, and that that portion of the divisible surplus made up of earnings from investments and reduced liability by reason of lapsed or forfeited policies, at least, becomes payable from the insurance company to its policy holders in the same way that dividends become payable to partners and members of joint-stock companies out of the common fund accumulated by way of profits of business ventures in which they may be engaged, and can in no sense be held to be "returned premiums" within the meaning of the statute.

The error in the argument may be made apparent. In the first place, partnerships and joint-stock companies organized for business purposes are organized for the purpose of making profits out of the investment. Each member contributes a certain share to the joint capital of the enterprise, which is in the nature of a permanent investment so long as the business continues. The inducement

for the investment is the expected dividends or profits to be derived from the conduct of the business.

But a mutual life insurance company is organized upon an entirely different basis. It is organized for the purpose of furnishing life insurance at cost. There is no such thing as dividends or profits, properly speaking, in connection with its business. In fixing its arbitrary level premium the company overestimates the death rate and administration expenses, and underestimates the earning capacity of its investments, made up of premiums and the lapses and cancellations. At the end of the year, upon examination, it finds it has overcharged the insured a certain amount, and it simply refunds the same. We cannot see how the fact that a portion of the amount returned to the insured is made up of interest earnings on the premiums paid has any thing to do with the matter. If it is allowed to him in reduction of his next annual premium, it is returning to him a portion of the premium which he has paid. The increment by way of interest is substantially, if not in a strict legal sense, the property of the insured, and becomes attached to and a part of the premium paid. Keeping in mind the fundamental proposition that the scheme is to furnish insurance at cost, we feel justified and required to interpret the word "premium" as including, not only the actual money paid, but also any additions thereto by way of earnings of the premium in the way of interest. To hold with the Attorney General would be to say that the word "premium" means simply the actual money paid by the insured, and no matter how long it remains with the company, and no matter how much it may earn by way of interest, the increment is not premium at all, but is profits or dividends, and cannot be allowed in reduction of the tax. But the parties contemplate, when the policy is issued, that the premium shall be invested and earn interest, and that such earnings shall belong to the insured who paid the premium, and shall become a part of a total credit to him on insurance at cost.

A similar question has been before a few of the courts.

In Mutual Benefit Life Ins. Co. v. Herold (D. C.) 198 Fed. 199, the question was whether, under the federal revenue law (Act Cong. Aug. 5, 1909, c. 6, § 38, 36 Stat. 112, Fed. Stat. Ann. 1909 Supp. p. 829 [U. S. Comp. St. 1913, §§ 6300-6307]), the insurance company was compelled to pay the federal tax on the full level premium fixed in its policy, or whether the amount returned to its policy holders should be deducted. The court, in an exhaustive opinion, citing most, if not all, the cases, held that the amounts returned to, or allowed as a credit to, policy holders, should be deducted from the total amount of the premiums as fixed in the policies, and said:

"The true situation, however, is this: The policy is issued at a fixed premium, as determined by the company's table of rates. That stipulated premium cannot be increased, but may be lessened annually by so much as the experience of the preceding year has determined it to have been greater than the cost of carrying the insurance, and the difference between the amount of the stipulated premium and the cost of carrying the risk constitutes the so-called dividend. This difference, however, is not in any real sense a dividend. The term as used is technical and well understood in insurance circles, and, as so understood, has a widely different signification from that ordinarily attached to the word 'dividend.' It operates, as already stated, merely to abate or reduce the stipulated premium called for by the contract of insurance, to the extent and for the reason that it has been determined by experience that the policy holder paid for his insurance during the preceding year more than it actually cost the company to carry the risk. This excess payment represents, not profits or receipts, but an overpayment; an overpayment because, being entitled to his insurance at cost, and having paid more than it cost, he is equitably entitled to have such excess applied for his benefit. It makes no difference what this excess is called. The question is, What does it represent? Does it in any wise or to any extent represent earnings or profits received by the company, so as to constitute it a part of its income; or does it merely represent an overpayment?

"Under the terms of his policy, the policy holder may at his option withdraw such excess in cash, and thereby impart to it a quasi appearance of profits; but its character is not thereby changed. In that case, however, he would, if he desired to continue his policy, be required to pay the full premium as therein stipulated: whereas, if he desired such premium reduced to what experience had shown was the actual cost of his insurance, he could have the excess over such

cost applied in reduction of the stipulated premium, and pay only the cost price for the ensuing year; and, assuming that the cost price as determined by the experience of the first year remained the same for 5, 10, 15, or other number of years, that original excess payment would serve to carry his insurance at cost during all of the succeeding years. * * * *

"From the foregoing it appears that what the company receives in cash, and all that it so receives where the dividend is applied in abatement of renewal premiums, is the difference between the stipulated premium and the so-called dividend. In such cases the dividends are not sums paid to the policy holder and by him returned in cash. They are not 'income * * * received.' The policy holder has not paid the premium stipulated in his policy, but a premium reduced by his share of a fund, as ascertained by the directors, composed of excess premiums."

In Mutual Benefit Life Ins. Co. v. Commonwealth, 128 Ky. 174, 107 S. W. 802, the question was whether, under a statute requiring a tax to be paid upon "all premiums receipted for on the face of the policy for original insurance, and all renewal premiums received in cash or otherwise in this state," the insurance company should be charged with a tax upon the full amount of the premium specified in the policy, or whether there should be deducted from the sum the amount of dividend or surplus which was apportioned by the company annually in abatement of premiums. The court held that the insurance company should pay the tax upon the amount actually received by it, and not upon the total amount called for by the terms of the policy. The court said:

"Appellant, every year before a premium falls due, determines how much of the stipulated premium it will exact from the insured. The diminution, whether it be called a 'dividend' or a 'surplus,' goes in abatement of the renewal premium, and the insured pays only the difference. The insurance company therefore receives, not the full renewal premium, but the difference between the stipulated premium and this dividend or portion of surplus. * * *

"If we look only at the method of bookkeeping of the appellant and have regard only to the terms it uses, there is much in the appearance of the case thus presented to warrant the position of the commonwealth as to its right to tax the so-called 'dividends' said to be annually credited on the premiums due from policy holders, but the law looks below the mere appearance of things, and has regard to the reality;

and, thus looking, it sees that the appellant misuses the terms 'dividend' and 'credit,' and, as shown above, pays no dividends and allows no credit, but that, in reality, all that it does is to collect on the first premium a sum sufficient to meet the contingencies of any given year of the future, and then abstains from collecting any further overpayments while the first remains on hand."

The court quotes extensively from the case of Commonwealth v. Penn. Mutual Life Insurance Co., reported in 1 Dauph. Co. Rep. (Pa.) 233, from which we insert the following:

"The rate of premium was fixed at a figure higher than that which experience had shown to be sufficient to meet the risk. The insured could not be called upon to pay more than the rate so fixed. He might not be called upon to pay so much; in fact, he never was called upon after the first year to pay it at all, but an abatement was made at the beginning of each year, the amount of which depended upon the calculations of the actuary applied to the treasurer's statement of the business of the preceding year, and, in making this statement, the treasurer always included in his figures, as though it had been received by the company, the amount of this abatement, which had been made from the premiums of the preceding year, and which had not actually been received by the company. The amount of the abatement thus ascertained by the calculations of the actuary applicable to the premiums of each policy holder was then deducted from the amount of the premium stipulated for in the policy, and the balance only was collected and received by the company. These abatements are called on the books of the company and in its annual statements and its reports to the insurance commissioner 'dividends to policy holders' or 'surplus to policy holders.' But they are, in fact, just what we have stated above.   *   *   *   The calculations are made for the express purpose of determining how much of the amount which the company might receive shall not be received, and one of the items which make up the apparent amount, upon the basis of which this calculation is made, is the sum which was abated and not received during the preceding year. In short, the whole proceeding is merely a method by which the books of the company are made to show what would be the actual gross debtor and creditor account of the company, if the whole amount of the premiums was collected, and a part was afterwards returned to the policy holders, while, in fact, it is neither collected nor returned."

In each of the foregoing cases the decision is based upon the consideration that the insurance company is re-

quired under the statutes to pay upon the amount actually received by it, and consequently need not pay upon the amount which it allows to policy holders by way of abatement of premiums called for in the policy, and which it does not receive. The same reasoning is adopted by the English courts in cases arising under their income tax law. N. Y. Life Insurance Co. v. Styles [1899] 59 L. J. Q. B. 291, L. R. 14 App. Cas. 381, Tenant v. Smith [1892] 61 L. J. P. C. A. C. 150; Gresham Life Assurance Society v. Bishop, 71 L. J. K. B. 618, A. C. 287.

In New York Life Insurance Co. v. Styles, supra, it is said:

"Certain persons agree to insure their lives among themselves on the principle of mutual insurance. They take care to admit none but healthy lives. They contribute according to rates fixed by approved tables, and they invite other persons to come in and join them by insuring their lives on similar terms. The rates fixed by the tables are taken as being sufficient to provide for expenses, to meet liabilities, and to leave a margin for contingencies. What is to become of the surplus, if everything goes right? The practice is to take an account every year of assets and liabilities, and to give the insured the benefit of the surplus, either by way of reduction of premium or by way of addition to the sum insured. It can make no difference in principle whether the surplus is so applied or paid back in hard cash. In either case it is nothing but the return of so much of the amount contributed as may be in excess of the amount really required. I do not understand how this excess can be regarded from any point of view, or for any purpose, as gain or profit earned by the contributors. I do not understand how persons contributing to a common fund in pursuance of a scheme for their mutual benefit, having no dealings or relations with any outside body, can be said to have made a profit when they find that they have overcharged themselves, and that some portion of their contributions may be safely refunded."

We have had some difficulty in including gains from lapsed or forfeited policies within the term "returned premiums." It is perfectly plain that a return or allowance for overcharges and interest earned is a return of premiums paid. But, where the amount returned originates from premiums paid by others who have allowed their policies to lapse, it is more difficult to include them with-

in the term "returned premiums." To return a portion of a premium would ordinarily seem to be a repayment or allowance to some one who has overpaid what was due from him. But, as applied to mutual life insurance, we think a somewhat different view may and should be taken. As before seen, the arbitrary level premium is known to be larger than the cost of the insurance under ordinary normal conditions. One of the items of overestimation by way of costs to the insured is an underestimation of gains from lapses and forfeitures. Thus if, in fixing the level premium, the company estimates such gains at 1 per cent. on the premium paid, and the actual gain proves to be 2 per cent., the insured has paid $1 on the hundred too much, which amount is returned to him at the end of the year or allowed on his next annual premium. What is really returned to the insured is his overpayment, not what is received from the payment of others on policies which have been allowed to lapse. All this is contemplated by the parties when the contract of insurance is made. So it seems plain, keeping in view the fundamental proposition of insurance at cost, that what is actually returned to the policy holder is such portion of the premium which he has paid as has been found by the experience of the year not to be required to carry his insurance, taking into consideration all of the matters involved in fixing the contract level premium named in the policy. We are confirmed in this view by a discussion in Fuller v. Metropolitan Life Insurance Company, 70 Conn. 647, 41 Atl. 4, 10, and by the opinion of the Attorney General of California dated May 24, 1911, and the opinion of the Attorney General of Alabama dated December 8, 1911. In both of these opinions the question submitted by the taxing officers was whether a return of or allowance from the divisible surplus was a return of premiums within the terms of a statute like ours. They both are of the opinion that it is. .

It follows that the judgment of the district court was erroneous, and should be reversed, and the cause remand-

ed, with instructions to enter judgment for the plaintiff as prayed for in the complaint; and it is so ordered.

ROBERTS, C. J., concurs.

HANNA, J., being absent, did not participate in this decision.

### SYLLABUS BY THE COURT.